**CAMP WOLTERS ENTERPRISES, Inc., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 15453.

United States Court of Appeals
Fifth Circuit.

Feb. 29, 1956.

R. B. Cannon, Fort Worth, Tex., for petitioner.

L. W. Post, Sp. Asst. to the Atty. Gen., H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, Harry Baum, Sp. Assts. to Atty. Gen., R. P. Hertzog, Acting Chief Counsel for I. R. S., Washington, D. C., Claude R. Marshall, Sp. Atty., Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and RIVES and CAMERON, Circuit Judges.

HUTCHESON, Chief Judge.

This appeal by the taxpayer from a decision and order [1] of the Tax Court, redetermining petitioner's tax liability for the fiscal years ending March 31, 1948 and 1949, presents for our decision a single question, the correct basis for depreciation and gain or loss of certain contracts acquired by it in 1947 from its stockholders.

Urging upon us that the Tax Court's decision is erroneous and may not stand, petitioner thus poses the question and states the answer:

"What was Petitioner's basis for gain or loss, and depreciation, of the Camp Wolters' buildings, equipment, and materials acquired by Petitioner from the United States in 1947, viz., Was such basis $827,354.20, as contended by Petitioner, or $466,274.00, as found by the Tax Court of the United States?"

"The answer to this question turns on whether certain promissory notes totaling $411,080.20 (hereinafter sometimes referred to as 'building notes') issued by Petitioner in 1947 in payment for sundry claims against the United States were 'securities' within the meaning of Sec. 112(b) (5) of the Internal Revenue Code of 1939 [26 U.S.C.A. § 112(b) (5)], as found by The Tax Court of the United States, or whether such notes were mere purchase money obligations, as contended by Petitioner.

"Since the claims acquired by Petitioner with such notes, together with cash totaling $412,500, were turned over to the United States in 1947 in payment for Camp Wolters' buildings, equipment and materials (the major portion of which were sold, and the balance of which depreciated, within the taxable years involved in this proceeding), Petitioner contends that the Camp Wolters' buildings, equipment and materials cost it $827,354.20 made up of: (1) the cost to it ($412,500 in cash and notes) of the claims surrendered in part payment for the Camp Wolters' buildings, equipment, and materials; (2) the cash in the sum of $412,500 paid to the United States; and (3) other miscellaneous costs amounting to $2,354.20." [2]

1. 22 T.C. 737.

2. In support of this view, it thus summarizes its argument:

"The underlying facts in the case at bar are not in dispute. The Only issue between the parties is one of law. The parties agree:

"(1) That Petitioner's basis for the Camp Wolters' buildings, equipment, et cetera, is the total of the cash paid therefor, plus Petitioner's basis, whatever that may be as a matter of law, for the restoration rights acquired by Petitioner and given by it as part consideration for Camp Wolters' buildings, equipment and materials, and miscellaneous other costs totaling $2,350.00.

"(2) That Petitioner is entitled to allocate its aggregate cost or basis for the Camp Wolters' buildings, equipment and materials over the assets acquired and to compute gain or loss from sales and the depreciation sustained in the two taxable years before the Court on the basis of such allocated cost.

"Once Petitioner's total cost or basis for gain or loss and depreciation of the Camp Wolters' buildings, equipment and materials has been fixed, the parties are in agreement as to how such cost or basis should be allocated or apportioned over the several items of buildings, equipment and materials involved. Further, they are in agreement as to the useful life of the depreciable property involved. The sole difference between the parties, therefore, concerns the cost basis to

The commissioner, on his part, insisting: "The Tax Court correctly determined the basis of the rights acquired by taxpayer from its stockholders to be the same as in the hands of the transferor stockholders, not the face amount of notes issued in exchange.", thus states the question for decision:

"Whether property (contract rights) acquired by taxpayer corporation from its stockholders upon its organization, in exchange for cash and notes, was acquired in an exchange falling within Section 112(b) (5) and (c) (1) of the Internal Revenue Code of 1939, so as to require taxpayer under Sec. 113(a) (8) (A) to carry over the stockholder-transferor's basis for the property, with adjustments. The answer depends on whether (as the Tax Court unanimously held) the notes issued in exchange for the property constituted 'securities' within the meaning of Sec. 112(b) (5)."

"The ultimate issue on this appeal is the correct basis to taxpayer corporation, for purposes of determining depreciation and gains from sales, of certain contract rights acquired upon its organization in 1947 from its stockholders. The rights

Petitioner of the restoration rights surrendered by it as part consideration for the Camp Wolters' buildings, equipment and materials which cost or basis, in turn, fixes that portion of Petitioner's cost or basis for gain or loss, and depreciation, of the Camp Wolters' facilities, represented by Petitioner's expenditures in acquiring such rights.

\* \* \* \* \*

\* \* \* "If the buildings notes hereinabove referred to constituted 'securities' of petitioner corporation in the sense that that term is used in Sec. 112(b) (5) of the Internal Revenue Code of 1939 the decision below should be affirmed. If, on the contrary (as contended by Petitioner) *the notes in question did not constitute 'securities' within the purview of the mentioned statute, but were ordinary purchase money obligations*, then Petitioner correctly reported the cost to it of buildings and equipment salvaged and sold in its fiscal years ended March 31, 1948 and 1949, and the amount of depreciation sustained by it on those assets used in its rental business in the taxable years before the court and the decision below should be reversed. (Emphasis supplied.)

"The question of the meaning of the term 'securities' as used in various revenue statutes has been considered by the courts in a number of cases. The rule appears to be well settled that, where such an act does not define the term, *it denotes an obligation of a character giving the creditor (because of the issuance of such obligations) some assured participation in the business and that the term does not include evidence of indebtedness for short-term loans, or evidence of indebtedness representing temporary advances for current cor-* porate needs. Pinellas Ice and Cold Storage Co. v. Commissioner, 287 U.S. 462 [53 S.Ct. 257, 77 L.Ed. 428]; Cortland Specialty Co. v. Commissioner [2 Cir.], 60 F.2d 937, certiorari denied 288 U.S. 599 [53 S.Ct. 316, 77 L.Ed. 975]; L. E. Stirn, Inc., v. Commissioner [2 Cir.], 107 F.2d 390; Commissioner [of Internal Revenue] v. Sisto Financial Corp. [2 Cir.], 139 F.2d 253.

"The test as to whether notes are securities is not a mechanical determination of the time period of the note. Though time is an important factor, *the controlling consideration is an over-all evaluation of the origin and nature of the debt, the degree of participation and continuing interest in the business and the extent of the proprietary interest (arising because of the issuance of an obligation), the purpose of the advances, and other like considerations*.

"It is entirely within the discretion of the incorporators of a corporation, or the stockholders of an existing corporation, as to how much capital they wish permanently to embark in the operation of the business of the corporation, and whether other advances required for corporate purposes should be made in the way of loans. Stated in another way, it is entirely within the discretion of the incorporators, or stockholders of a corporation, as to whether they wish to transfer property to the corporation as paid-in capital or whether they prefer to sell the same to the corporation for a consideration to be paid to them by the corporation as purchase price. This is made abundantly clear by two very recent decisions of this court, namely, Rowan v. United States [5 Cir.], 219 F.2d 51, and Sun Properties, Inc., v. United States [5 Cir.], 220 F.2d 171." (Emphasis supplied.)

acquired consisted of (1) the right under a purchase agreement with the Federal Government to buy, for cash plus a release of the so-called restoration rights, buildings and other improvements erected by the Government as lessee of lands known as Camp Wolters; and (2) the restoration rights, i. e., the right under the terms of the lease to require the lessee-Government to dismantle the buildings and improvements and restore the leased premises to their original condition. The issue turns on whether these rights were acquired by taxpayer pursuant to a tax-free exchange falling within the provisions of Sec. 112(b) (5) and (c) (1) of the Internal Revenue Code of 1939, and this in turn depends on whether the notes issued by taxpayer in exchange for the rights constituted 'securities' within the meaning of Sec. 112(b) (5). If the rights were acquired in a Sec. 112(b) (5), 112(c) (1) exchange, then under Sec. 113(a) (8) (A) the basis to taxpayer is the same as in the hands of the transferor-stockholders."[3]

The material facts are not in dispute, and since the opinion of the Tax Court sets them all out in detail, it will be sufficient to state them here only in briefest summary.[4]

3. He thus summarizes his argument in support of this view:

"The Tax Court correctly held that the transfer of property (restoration rights) to taxpayer corporation by its stockholders in exchange for cash plus notes constituted a tax-free exchange falling within Sec. 112(b) (5) and (c) (1) of the Internal Revenue Code of 1939, and that consequently taxpayer was required under Section 113(a) (8) (A) to use the transferor-stockholders' basis for the property with adjustment for the cash boot received) in computing depreciation and gains from sales. The control and proportionate interest requirements of Sec. 112(b) (5) admittedly were met; and the record fully supports the Tax Court's unanimous conclusion that the other requirement was also met, namely, that the property was transferred for 'stock or securities'. The comprehensive term 'securities' is used in Sec. 112 (b) (5) in its ordinary and generally accepted sense. It embraces all classes of debt instruments, including bonds, debentures and notes, except those of such short duration as to make them essentially equivalent to a payment in cash. Under the decisions of the Supreme Court and other courts, the Tax Court properly concluded that the series of eighty-nine notes here involved were 'securities' received upon a tax-free exchange within the purview of Sec. 112(b) (5), rather than the equivalent of cash received upon a taxable sale. The notes were payable in installments from five to nine years after issue, were unsecured and payable pro rata only out of available funds, and were subordinated to a large bank loan. They were no less 'securities' than other debt instruments which have been held to fall in that category. The various theories upon which taxpayer seeks to exclude the notes from the category of 'securities' find no support in the statute or the decisions or elsewhere. The cases upon which it relies are not comparable, since they involved short-term loans; moreover, they turned on whether the 'continuity of interest' requirement of a corporate reorganization had been met—a question not here presented—rather than on whether the instruments involved constituted 'stock or securities' received upon a Sec. 112(b) (5) exchange."

4. The issue arises in the following manner. The City of Mineral Wells leased certain land and then subleased it to the Government, which built extensive improvements. The lease gave the City an option to purchase the land, and the sublease required the Government upon its termination to remove the buildings and restore the premises to their original condition. When, early in 1946, the Government decided to deactivate Camp Wolters, a group of eighty-nine persons, the Dennis group, acting through an agent (Mims) acquired the City's option to purchase and then exercised the option by paying $151,000 to the original lessors for both the land and the appurtenant restoration rights. The Dennis group then contracted to purchase from the Government the buildings and improvements which the latter had erected on the land, for $412,500 cash plus a release of the restoration rights and shortly thereafter organized the taxpayer corporation with a total capital and surplus of $204,240 paid in out of the Group fund, and all of taxpayer's stock was issued to the eighty-nine members of the Group in proportion to their respective contributions to the

Building upon this framework of undisputed facts and disputed contentions, petitioner and respondent each labors mightily to bring us to his view, petitioner insisting: that it is a complete misapprehension of the facts and as complete a distortion of the language and sense of the statute to find and hold, as the Tax Court did, that the notes were, within its meaning, securities and that a tax free exchange resulted; while respondent, on its part, insists that petitioner's position is untenable, the Tax Court's decision is unassailable.

While petitioner, in its argument, does correctly state the test as to whether notes are securities, we think it clear that, too greatly preoccupied with the name given to and the time periods of the securities in this case, it has, with foreshortened gaze, failed to see the picture whole. Giving little or no recognition to the fact that the notes did not evidence an isolated transaction of purchase and sale, having its inception after the forming and launching of the corporation, but were an integral part of the scheme of its forming and financing, petitioner has wholly misapplied the test to the undisputed facts that petitioner was brought into being for the sole purpose of obtaining from the stockholders in exchange for cash and securities, stocks and notes, the properties of the enterprise, the lands, the buildings and the rights.

Perhaps the main, certainly the most important, aspect of petitioner's preoccupation is its failure to see that in forming and launching the corporation, in part on money paid in by, but in much larger part on notes given to its stockholders, the giving of the notes was not a separate purchase from the stockholders, decided upon and made after the corporation had been fully formed and launched, but was an integral part of the pot luck no pay no cure plan, formed before incorporation, of launching petitioner with cash and securities in note form.

■ This preoccupation appears throughout the brief of petitioner. It is particularly evident where, after correctly stating, "The rule appears to be well settled that where such an act does not define the term 'securities' it denotes an obligation of a character giving the creditor, because of the issuance of such obligation, some assured participation in the business and that the term does not include evidence of indebtedness for

Group fund. A few days after taxpayer's incorporation, the stockholders transferred to it the land, the contract right to purchase the buildings and improvements, and the restoration rights. In exchange for the land taxpayer gave them eighty-nine 'land notes' totaling in face amount $151,336, and took this as its basis for the land and no controversy is presented with respect to this. In exchange for the rights it gave them eighty-nine 'building notes' totaling in face amount $411,080 plus $1424 in cash. Taxpayer then borrowed $325,000 from a bank (to which loan the notes were subordinated) and promptly carried out the contract to purchase the improvements by paying to the Government $412,500 cash and surrendering the restoration rights.

"In its returns for the taxable years, for purposes of computing depreciation and gains from the sales of the buildings and improvements, taxpayer included in its basis the sum of $827,354, consisting of (1) the $1424 cash paid to its stockholders for assignment of the purchase and restoration rights; (2) the $411,080 face amount of building notes issued to the stockholders as additional consideration for those rights; (3) the $412,500 cash purchase price paid to the Government under the purchase contract; and (4) $2,350 of additional cash expended. The Commissioner accepted all of the above components except item (2) above, namely the amount of the building notes. The Tax Court, in a decision reviewed by the full court, unanimously sustaining it in part, held: that taxpayer acquired the purchase and restoration rights from its stockholders pursuant to tax-free exchange under Sec. 112(b) (5); that consequently, by virtue of correlative Sec. 113(a) (8) (A), taxpayer's basis for those rights was the same as in the hands of the transferor-stockholders (which is found to be 50,000) plus the amount of gain (the $1424 cash boot received by the stockholders) recognizable upon the exchange under Sec. 112(c) (1).

short term loans or evidences of indebtedness representing temporary advances for current corporation needs.", petitioner fails to correctly apply it because it fails to see that that is exactly what occurred here, to-wit: the "rights" notes, the land notes and the stock were together different forms of the assured participation in the pot luck of the enterprise. The notes did not represent "evidence of indebtedness either for short term loans" or "temporary advances for current corporate needs". They, the stock and the cash were equally evidence of participation.

We are of the opinion that the Tax Court answered the question correctly and that for the reasons so carefully and correctly stated by it, its decision and order should be affirmed. We particularly agree with these statements in its opinion:

"The test as to whether notes are securities is not a mechanical determination of the time period of the note. Though time is an important factor, the controlling consideration is an overall evaluation of the nature of the debt, degree of participation and continuing interest in the business, the extent of proprietary interest compared with the similarity of the note to a cash payment, the purpose of the advances, etc. It is not necessary for the debt obligation to be the equivalent of stock since Sec. 112(b) (5) specifically includes both 'stock' and 'securities'.

\* \* \* \* \* \*

"In the instant case, the petitioner issued 89 non-negotiable unsecured installment notes in exchange for assignment of the 'contract' and restoration rights of April 7, 1947, four days after petitioner was incorporated. The 'contract' and restoration rights constituted permanent contributions to petitioner's business, not merely temporary advances of rights to be used for current needs. These interest-bearing notes became due in five equal annual installments between the fifth and ninth year after issuance. Petitioner had the privilege of paying the notes off before the due date, subject to two general provisions: (1) Any payment on the notes had to be on a pro rata basis for the entire series of 89 notes; (2) petitioner borrowed $325,000 from the Republic National Bank and no payment whatsoever was to be made on the notes until the $325,000 loan and any renewals, extensions, or refinancing had been completely liquidated. In other words, the latter requirement imposed a condition precedent to the due date of the notes. In the event petitioner had been unsuccessful and unable to pay off the prior loan, the holders of the 89 notes had no right to demand the installment payments on the due dates. It seems clear that the noteholders were assuming a substantial risk of petitioner's enterprise, and on the date of issuance were inextricably and indefinitely tied up with the success of the venture, in some respects similar to stockholders. As a matter of fact, all 89 notes were redeemed within two years, but we must examine the notes as of the date of issuance. Having considered all the facts, we conclude that the 89 notes constitute 'securities' under Sec. 112(b) (5) and that, consequently, the transaction falls within the provisions of that and the other aforementioned sections."

The judgment is right. It is affirmed.