EVANGELOS & ANASTASIA GIOUZELIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Giouzelis v. Commissioner
Docket No. 15083-89
United States Tax Court
T.C. Memo 1991-595; 1991 Tax Ct. Memo LEXIS 645; 62 T.C.M. (CCH) 1353; T.C.M. (RIA) 91595; December 2, 1991, Filed *645 Decision will be entered under Rule 155. Kenneth A. Burns, for the petitioners. David W. Sorensen, for the respondent. FAY, Judge. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in income tax and additions to tax for the years in issue as follows:  Additions to Tax, Section [1]
Year
Deficiency
6653(b)(1) [2]
6653(b)(2)
6654
6661
1982
$ 52,919.28
$ 13,229.81
*
$ 4,951.66
$ 5,291.92
1983
7,659.28
1,753.50
*
508.84
765.92
1984
43,397.89
10,849.48
*
2,878.10
4,339.78
1985
78,463.45
19,615.86
5,680.31
7,846.34
*646 The issues [3] *647 presented for our decision are as follows: (1) Whether petitioners underreported their income for the years in issue; (2) whether petitioners are liable for additions to tax for fraud pursuant to section 6653(b) for each of the years in issue; (3) whether petitioners are liable for additions to tax for failure to make required estimated tax payments pursuant to section 6654 for each of the years in issue; and (4) whether petitioners are liable for additions to tax for substantial understatement pursuant to section 6661 for each of the years in issue. [4]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts together with the attached exhibits are incorporated herein by this reference. Petitioners resided in Las Vegas, Nevada, at the time the petition in this case was filed. Petitioners timely filed their joint Federal income tax returns for the years in issue, and on those returns petitioners reported the following income: 1982
1983 1984 1985 Wages
$ 26,764.32
$ 26,129.02
$ 30,247.10
$ 28,331.55
Tip Income [5] *648 30,100.00
32,000.00
30,500.00
35,400.00
Remainder items (net)
2,742.75
1,723.86
3,172.23
6,291.80
Total Income
$ 58,607.07 [6]
$ 59,852.88
$ 63,919.33
$ 70,023.35
In 1975, Evangelos Giouzelis (hereafter petitioner), a college graduate, was employed by Caesar's Palace Resort Hotel and Casino as a captain in a gourmet room. Several years later, petitioner was promoted to maitre d' of the Circus Maximus Showroom (hereafter Showroom). [7] During all subsequent years, including the years in issue, petitioner worked as a maitre d' in the Showroom. As maitre d', petitioner received cash tips. Occasionally, petitioner would receive tips directly from patrons. Also, petitioner would receive a share of the tips received by the captains during the seating prior to each show. Rather than physically pooling the tips, each captain would place tips received in his own pocket. *649 After the seating, the captain who first completed his side duties would locate the other captains and inquire as to the dollar amount of tips received that night. The verbal responses given [8] were used to tally the total amount of tips received in the Showroom that night. The total was then divided into shares, each captain, assistant maitre d', and the maitre d' receiving one share. Any captain who received tips greater than his share gave up the difference to someone who received less than his share. During the years in issue, petitioner did not maintain any written diary, log, worksheet, or other contemporaneous accounting of his tip income. Petitioner knew that the Internal Revenue Code (hereafter IRC) requires the keeping of such records with regard to tips received. This is because petitioner had been previously audited for unreported tip income. Also, petitioner was aware that *650 his predecessor had been criminally convicted for failing to report his tip income. In 1979, petitioners purchased a two and one-half acre lot for $ 95,000 from the Moore family (hereafter the Moore property). In 1980, petitioners purchased another two and one-half acre lot adjacent to the Moore property for $ 125,000 from Sally Jacobson (hereafter the Jacobson property). [9] In late 1981, after the Moore property was paid for in full, [10] construction began on the property. Construction was near completion by the end of 1985. During this period, petitioners did not maintain accurate records of their construction costs despite the fact that they paid cash for all construction materials. As completed, a perimeter wall made of brick (approximately 100 feet by 300 feet) surrounds *651 the house and a portion of the property. The property inside the brick wall has been nicely landscaped with trees, bushes, and flower gardens. The house itself is brick and has two levels with approximately 7,000 square feet. Attached to the house is a two-car garage. In the rear of the property, a guest house has been built which is approximately 750 square feet and contains a full bathroom and an air conditioning and heating unit. Also in the backyard, a pool with jacuzzi and slide has been built. During the investigation by respondent and throughout trial, petitioners made numerous false and misleading statements. For example, petitioner originally indicated he calculated annual tip income as the excess of amounts drawn from his checking account over the total of his W-2 and other non-tip income. [11] Later, petitioner indicated he computed his tip income using a weekly average method. Finally, at trial petitioner admitted that he guessed as to the amount of his annual tip income. In addition, petitioners originally told respondent's agents only about the Jacobson property and that their home was being constructed on the Jacobson property when in fact the construction *652 was on the Moore property. [12] During the initial interview with respondent's agents, petitioners stated they always kept between $ 500 and $ 1,000 in cash on hand. However, after being confronted by respondent's agents with regard to the Moore property, petitioner stated that $ 15,000 which was used as part of the down payment for the Moore property came from a safe deposit box containing between $ 10,000 and $ 25,000. Also, during interviews with respondent's agents, petitioner claimed that in 1982 he repaid $ 10,000 borrowed from his brother-in-law in 1979. Petitioner told respondent's agents that he would provide a letter from his brother-in-law establishing the timing of repayment. No such letter was ever received. At trial, however, petitioner claimed to have repaid this loan during 1986 or 1987 and denied making the earlier statements. Also during these interviews petitioner claimed to have moved into the main house in 1983. At trial, petitioner denied moving into the main house until 1985. Petitioners also told respondent's agents that a $ 4,000 check made out to cash and cashed at a Cadillac agency was for repairs on his automobile. In fact, petitioners had purchased *653 a Cadillac. Finally, [13] we note that petitioners originally stated they had receipts for all construction materials. Later they claimed all receipts were not kept. At trial, petitioner testified no gifts, inheritances, or other sources of income were received. In addition, we find that petitioners had, at the most, $ 4,618 [14] in their safe deposit box as of January 1, 1982. According to respondent's source and application of funds analysis, petitioners expended all of their *654 earnings and various loan proceeds and, over the four-year period, had inadequate funds with which to build their home: 1982
1983
1984
1985
SOURCES OF FUNDS
$ 105,338 $ 177,946 $ 126,763 $ 102,554 Less Applications of
Funds Other than
Construction Costs
(140,923)
( 73,914)
(104,327)
(131,341)
Funds Available for
Construction of Home [15] *655 ( 35,585)
104,032 22,436 ( 28,787)
Less Construction
Costs (including
Jacuzzi)
( 60,218)
( 94,782)
( 96,783)
(118,484)
Alleged Unreported
Income [16] *656 ( 95,803)
9,250 [17]
( 74,347)
(147,271)
OPINION Unreported Income
At the conclusion of the trial of this case, the parties were directed, pursuant to Rule 151, to file simultaneous opening briefs on or before January 31, 1991, followed by simultaneous reply briefs on or before March 4, 1991. Respondent filed an opening brief in accordance with the Court's direction. Petitioners have not filed a brief. Under these circumstances, we could find petitioners have conceded those issues on which they have the burden of proof. See Mock v. Commissioner, T.C. Memo 1987-382. We decline to do so, however, and will decide those issues on the basis of the stipulation of facts and its attached exhibits, the record made at the trial, and respondent's brief. There is no question that tips constitute compensation for services rendered and must be included in gross income pursuant to section 61. Olk v. United States, 536 F.2d 876 (9th Cir. 1976). *657 Further, all taxpayers are required to maintain records sufficient to determine their correct tax liability. Sec. 6001; Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965). If taxpayers do not maintain adequate records of tip income, the Commissioner may compute income in a manner that clearly reflects income. Sec. 446(b). The Commissioner's initial determination that a taxpayer has received unreported income is presumptively correct, and the taxpayer has the burden of overcoming this presumption by a preponderance of the evidence. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). Upon review of the record, we find petitioners have failed to overcome the presumption of correctness attaching to respondent's initial determination that petitioners received unreported income. We do, however, find that respondent's cost reconstruction of petitioners' home is overstated. First, we find that a $ 1,500 payment made to Nevada Power Company was made in 1981. Second, petitioner claims that he designed the home and, with the aid of friends, purchased all materials and performed 95 percent of the labor. For the most part, we do not find *658 petitioner's testimony credible, and, therefore, we reject petitioner's contention that he and his friends performed 95 percent of the labor. However, it is apparent from the record that petitioner performed some of the labor involved in the construction of his home. Therefore, based on the record, we find that petitioner installed the tile and the wood floor, one-half of the plumbing, and one-half of the electrical system. We also find petitioner performed all of the labor attributable to building the garage. While petitioner did testify as to other skilled tasks performed by certain individuals for less than respondent's expert's cost reconstruction, he called none of those individuals as witnesses. Therefore, with regard to these skilled tasks, we cannot conclude petitioners paid less than the amounts determined by respondent. As for the witnesses petitioners did call, most (if not all) were employees at the Showroom who, at the time of trial, worked for petitioner. Several of these witnesses claimed to have assisted petitioner in the construction of petitioners' home. Their testimony, however, focused primarily on landscaping tasks. We accept their testimony regarding *659 landscaping tasks, and therefore, we find petitioner, with the help of others, performed all of the labor attributable to the landscaping. Finally, based on the record, we cannot conclude that construction materials were purchased for amounts less than determined by respondent. Civil Fraud Addition to Tax
Section 6653(b)(1) provides that "If any part of any underpayment * * * of tax * * * is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." Fraud is intentional wrongdoing on the part of the taxpayer with specific intent to avoid tax known to be owing. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. Respondent must prove fraud by clear and convincing evidence. Sec. 7454(a). To satisfy his burden of proof, respondent must show two things. First, respondent must prove that an underpayment exists; and second, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner94 T.C. 654 (1990). In proving the first *660 prong of the fraud test, respondent cannot rely on a taxpayer's failure to carry his burden of proof. However, in this case respondent has shown that a likely source of the unreported income was tips received at the Showroom. The tips were received in cash, and petitioner failed to maintain any records to establish the amount of the tips received. In addition, other than our conclusion concerning respondent's overstatement of construction costs incurred in the building of petitioners' home, we find respondent's source and application of funds accurate and reliable. As for cash on hand, respondent has shown petitioners spent far more than they reported in 1981, and as of January 1, 1982, petitioners' safe deposit box contained no more than $ 4,618.00. Respondent has also shown that petitioners received no gifts or inheritances. Thus, we conclude that, except for 1983, respondent has carried his burden of proving that an underpayment exists. Under the second prong of the fraud test, respondent must prove by clear and convincing evidence that petitioners had the requisite fraudulent intent. Parks v. Commissioner, supra at 664. Because fraudulent intent *661 is rarely established by direct evidence, fraudulent intent may be inferred from circumstantial evidence, i.e., "badges of fraud." Bradford v. Commissioner, supra at 307. As discussed below, we find that respondent has met his burden of proving fraudulent intent. In this case, petitioners substantially understated their income for three of the four years in issue. In addition, although petitioner knew that the IRC required the maintenance of records, he failed to maintain any records of his tip income and has not adequately explained the reasons for such failure. Also, in an attempt to avoid scrutiny, petitioners paid cash for the construction of their home and failed to maintain adequate records of these costs. Finally, as previously illustrated, petitioners have made numerous false and misleading statements. In conclusion, except for 1983, respondent has satisfied his burden of proving both prongs of the fraud test by clear and convincing evidence. Therefore, for 1982, 1984, and 1985 we find petitioners liable for the addition to tax for fraud. Section 6654 Addition to Tax
Section 6654(a) imposes an addition to tax for any underpayment of estimated *662 tax by an individual. Where prepayments of tax, either through withholding or by making estimated quarterly tax payments during the course of the year, do not equal the percentage of total liability required under the statute, imposition of the addition to tax is generally mandatory, unless the taxpayer shows that one of several statutory exemptions applies. Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). Petitioners have made no such showing. Therefore, after taking into account all concessions and adjustments, if the Rule 155 computation, which we will direct, reveals that petitioners underpaid their estimated tax for any year, then we will sustain the additions to tax for that year. Section 6661 Addition to Tax
Section 6661 provides for an addition to tax on any underpayment attributable to a "substantial understatement" of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Respondent has determined that petitioners are liable for additions to tax pursuant to section 6661 for the years in issue. Petitioners have presented no evidence to the contrary. *663 Therefore, after taking into account all concessions and adjustments, if the Rule 155 computation, which we will direct, reveals that petitioners substantially understated their income tax liability for any year, then we will sustain the addition to tax for that year. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent points out a computational error in the notice of deficiency concerning the amount of the section 6653(b)(1)↩ addition to tax. The parties should resolve this computational error in their Rule 155 computations.
*. An amount to be determined.↩
3. On November 26, 1991, we denied respondent's oral motion to dismiss petitioner Anastasia for lack of prosecution. Also, as discussed below, we find that, except for 1983, the fraud addition to tax pursuant to section 6653(b) applies. The elements of fraud pursuant to section 6653(b)↩ are essentially the same as those pursuant to section 6501(c)(1). Thus, except for 1983, we conclude that petitioners knowingly filed fraudulent returns with the intent to evade the payment of Federal income tax, and, therefore, respondent's notices of deficiency were timely mailed for those years. See sec. 6501(c)(1).
4. Respondent has suggested that this Court consider, sua sponte, a penalty pursuant to section 6673. While this Court can raise section 6673 sanctions, sua sponte, we decline to do so here.↩
5. Petitioner Evangelos admitted that he estimated or guessed as to the amount of tips received. The amount of tip income was orally reported to petitioners' tax return preparer.↩
6. The correct sum of these items is $ 59,607.07.↩
7. The record conflicts as to the year petitioner was promoted to maitre d' of the Showroom. The parties stipulated the year was 1980 but petitioner testified the year was 1978.↩
8. The system was purely voluntary, and, in their responses, some captains understated the amount of tips actually received.↩
9. The stipulation of facts conflicts with the testimony concerning the timing of the purchases of these properties.↩
10. According to the contract for sale, petitioners could not begin building on the property until it was paid for in full.↩
11. For this method to be accurate, all tips would have to have been deposited into petitioners' checking account. Petitioner testified all tips were not deposited into the checking account.↩
12. Petitioners had previously claimed interest deductions for interest payments attributable to the Jacobson property. No such deductions had been claimed regarding the Moore property.↩
13. Although the record reflects that petitioners made numerous other false and misleading statements, we do not feel listing each and every one is necessary.↩
14. In 1981, petitioners spent far more than the $ 59,856 reported on their 1981 joint Federal income tax return. In addition, although petitioners claimed to have had up to $ 25,000 in their safe deposit box as of January 1, 1981, during 1981 petitioners paid $ 20,382 in tax payments from their safe deposit box, leaving, at the most, $ 4,618 available beginning January 1, 1982.↩
15. During the investigation and throughout trial, petitioner's estimates of total construction costs varied from $ 100,000 to $ 180,000. Even assuming, arguendo, we were to accept petitioner's lowest estimate of $ 100,000, over the four-year period, petitioners still would not have had adequate funds available for construction.↩
16. The amount of the alleged unreported income is taken from the notice of deficiency (or from stipulated exhibits 20-T and 21-U) except that we reduced construction costs to correct an error made by respondent's expert concerning the area of the property inside the perimeter wall. In his brief, respondent alleged significantly greater amounts of unreported income (after adjusting for the error in construction costs). On September 12, 1991, this Court ordered respondent to file a response reconciling the amount of unreported income as alleged in his brief with exhibits 20-T and 21-U. This Court also ordered petitioners to respond to respondent's reconciliation. On September 25, 1991, respondent filed Respondent's Response to the Court's Order. On October 7, 1991, petitioners filed Petitioners' Response to Respondent's Response to Court Order. In his above-referenced response, respondent concedes certain items were not taken into account in his brief. After taking these concessions into account, we conclude that a significant portion of the increased unreported income in respondent's brief is attributable to two source items that were initially included in respondent's source and application of funds analysis. Respondent now claims these two source items should not be included. The possible exclusion of these two source items from respondent's source and application of funds analysis, and the treatment of the items attributable to the remainder of the increase, were not raised at trial, and we hold that it is too late to raise them now. Accordingly, we use the amounts indicated above.↩
17. A positive amount represents funds available but not expended in a particular year. Thus, we conclude a positive amount should be used to reduce any unreported income in subsequent years.↩